## UNITED STATES  DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**KEVIN SHOLES #270357**                          **CIVIL ACTION**

**versus**                                         **NO. 06-1831**

**BURL CAIN, WARDEN**                              **SECTION: "T" (3)**

## REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  See 28 U.S.C. § 2254(e)(2).[1]  Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

---

[1]  Pursuant to 28 U.S.C. § 2254(e)(2), whether to hold an evidentiary hearing is now a statutorily mandated determination.  According to Section 2254(e)(2), the district court generally may hold an evidentiary hearing only when the petitioner has shown that either the claim relies on a new, retroactive rule of constitutional law that was previously unavailable (28 U.S.C. § 2254(e)(2)(A)(i)) or the claim relies on a factual basis that could not have been previously discovered through the exercise of due diligence (28 U.S.C. § 2254(e)(2)(A)(ii)); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner (28 U.S.C. § 2254(e)(2)(B)).

Petitioner, Kevin Sholes, is a state prisoner incarcerated at the Louisiana State Penitentiary, Louisiana.  On November 12, 1998, he was convicted of second degree murder in violation of La.Rev.Stat.Ann. § 14:30.1.[2]  On December 1, 1998, he was sentenced to life imprisonment without benefit of probation, parole, or suspension of sentence.[3]  On March 7, 2001, the Louisiana Fourth Circuit Court of Appeal affirmed his conviction and sentence.[4]  He then filed with the Louisiana Supreme Court a related writ application which was denied on February 22, 2002.[5]

On or about November 21, 2002, petitioner filed with the state district court a *pro se* application for post-conviction relief,[6] which was subsequently supplemented by counsel.[7]  After an evidentiary hearing, the trial court granted the application on January 31, 2005.[8]  The state filed

---

[2]  State Rec., Vol. II of IV, minute entry dated November 12, 1998; State Rec., Vol. II of IV, jury verdict form.

[3]  State Rec., Vol. II of IV, transcript of December 1, 1998, p. 3; State Rec., Vol. II of IV, minute entry dated December 1, 1998.

[4]  State v. Sholes, 782 So.2d 691 (La. App. 4th Cir. 2001) (No. 99-KA-2414); State Rec., Vol. II of IV.

[5]  State v. Sholes, 810 So.2d 1136 (La. 2002) (No. 2001-KO-1014); State Rec., Vol. II of IV.

[6]  State Rec., Vol. III of IV.

[7]  State Rec., Vol. III of IV.

[8]  State Rec., Vol. III of IV, transcript of January 31, 2005, pp. 6-7; State Rec., Vol. III of IV, minute entry dated January 31, 2005.

an application for supervisory writs[9] which was denied on April 20, 2005.[10] The state then filed with the Louisiana Supreme Court an application for supervisory writs.[11]  On January 9, 2006, the Louisiana Supreme Court granted that writ application and reinstated petitioner's conviction and sentence.[12] Petitioner filed an application for rehearing which was denied by the Louisiana Supreme Court on March 17, 2006.[13]

On April 7, 2006, petitioner, through counsel, filed this federal application for *habeas corpus* relief.[14]  In support of his application, he raises the following claims:

1.   The prosecution withheld favorable evidence in violation of Brady

v. Maryland, 373 U.S. 83 (1963), and its progeny; and

2.   Petitioner received ineffective assistance of counsel.

At petitioner's request, the Court held oral argument in this case on May 16, 2007.

---

[9] State Rec., Vol. III of IV.

[10]   State v. Sholes, No. 2005-K-0329 (La. App. 4th Cir. Apr. 20, 2005) (unpublished); State Rec., Vol. III of IV.

[11]   State Rec., Vol. IV of IV.

[12]   State v. Sholes, 920 So.2d 212 (La. 2006) (No. 2005-KP-1290).

[13]   State v. Sholes, 925 So.2d 524 (La. 2006) (No. 2005-KP-1290).

[14]   Rec. Doc. 1.

The state does not argue that petitioner's federal application is untimely or that he failed to exhaust his state court remedies.[15]  Accordingly, this Court will address the merits of his claims.

Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law, and mixed questions of law and fact.  Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1) and questions of fact are reviewed under § 2254(d)(2).  Hill v. Johnson, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  The United States Supreme Court has noted:

> § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning.  A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts.  The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but

---

[15] To the contrary, the state expressly waives its exhaustion defense with respect to the ineffective assistance of counsel claim.  Rec. Doc. 5, p. 16.

unreasonably applies it to the facts of the particular case.  The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams[ v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002) (citations omitted).

As to questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); see also Hill, 210 F.3d at 485; 28 U.S.C. § 2254(e)(1).

Facts

On direct appeal, the Louisiana Fourth Circuit Court of Appeal summarized the facts of this case as follows:

At approximately 10:30 p.m. on September 3, 1997, Warren McKay was sitting outside his house on Laussat Place with his friend, Tyrone Jones.  While he and Jones were talking, the defendant approached them and asked Warren where was his brother, Walter McKay.  Warren told the defendant that Walter was inside the house. The defendant then went inside the house.  A few minutes later, Warren heard a gunshot.  He ran inside.  The defendant told Warren that Walter had shot himself.  The defendant then pushed Warren to the side and left the house.  Warren heard gasping coming from the bedroom.  He walked into the bedroom and saw his brother lying on the floor, bleeding.  The witness turned over the mattress on the bed and found his brother's .38 caliber revolver.  He took the gun and ran outside. Warren told Tyrone that they needed to get his brother to the hospital.  He then ran after the defendant.  While running, he borrowed a neighbor's phone and called the police.  The witness, realizing he could not find the defendant, went home and put the gun away.  Warren then stayed with the victim until the police arrived. The witness told the officers that the defendant shot his brother.  He acknowledged that his brother was a drug dealer.  He stated that the victim had several thousand dollars in the ceiling above the bedroom.

- 5 -

However, that money was missing after the shooting. The next day, Warren found a .45 casing while cleaning the house. He turned it over to the police. The witness identified the defendant at trial and in a photographic lineup.

Tyrone Jones testified that at approximately 10:00 p.m., he picked up Warren McKay from his house and went for a ride. They came back about twenty minutes later. When they returned to Warren's house on Laussat Place, they sat on his car and talked. While they were sitting on the car, the defendant walked up and asked if they knew where the victim was at that time. Jones and Warren told the defendant that the victim was inside the house. The defendant then went inside the house. Shortly thereafter, Jones heard a gunshot. Warren jumped off the car and ran inside. The defendant came out of the house and said that the victim had been shot. Jones then went to call the police. The witness noted that the defendant had his hands in his pockets when the defendant left the house. Jones identified the defendant at trial and in a photographic lineup. He acknowledged that he did not see the shooting.

Gerald Gillard, the victim's uncle, stated he was sleeping at the time of the shooting. He was awakened by the gunshot. As Gillard approached the bedroom, he observed the defendant leaving the house. The defendant had his hand in his pockets. The defendant did not say anything but made a face and then left the house. The witness identified the defendant at trial and in a photographic lineup. He also acknowledged that he did not see the shooting.

Dr. Paul McGarry, a forensic pathologist with the Orleans Parish Coroner's office, performed an autopsy on the victim. Dr. McGarry testified that the victim died from a single gunshot wound to the chest. The bullet entered the chest and passed through the left lung and pulmonary aorta, causing massive internal bleeding. He removed the bullet from deep tissue in the right upper back. Dr. McGarry stated that the wound was not consistent with a theory of suicide or a self-inflicted injury. Chemical tests revealed the presence of cocaine in the victim's body.

Officer Ricky Jackson responded to a call at 3057 Laussat Place at approximately 10:20 p.m. on September 3, 1997. When he arrived on the scene, he observed a black male lying on the floor in a bedroom. The subject had a gunshot wound to the chest and was bleeding profusely. The officer then notified an emergency medical unit. Officer Jackson secured the two witnesses in the house, Warren McKay and Mr. Gillard, until the homicide detectives arrived.

Det. Calvin Brazley, the lead homicide investigator, arrived on the scene shortly thereafter. When he arrived on the scene, he observed that the residence was a single-family dwelling. He went into the bedroom and noted that, in addition to the bed, there was a dresser, a chiffirobe and a television in the room. The victim was lying on the floor, on the right side of the bed. Emergency medical technicians were treating the victim. There was a large puddle of blood, with footprints in it, near the victim. Several drawers were missing from the dresser. A spoon was on top of the dresser. Small portions of crack cocaine were found in a couple of the dresser drawers. A sheet of paper with names and dollar amounts was found in the kitchen. A .45 caliber casing and two hundred twenty dollars were found on the scene. The officer obtained information concerning the defendant as a possible suspect. Det. Brazley obtained an arrest warrant for the defendant on September 4, 1997. The officer conducted photographic lineups with Warren McKay, Gerald Gillard and Tyrone Jones. All three men positively identified the defendant as the perpetrator. The witnesses also gave the officers statements concerning the shooting. Det. Brazley noted that no weapons were found on the scene. The officer learned that the victim had been involved in drug trafficking.

The parties stipulated at trial that if Officer Timmy Seuzeneux had testified at trial, he would have stated that he tested the .45 casing for fingerprints and found none.[16]

Brady Claim

In his state post-conviction application, petitioner claimed that the prosecution withheld from the defense favorable evidence, i.e. three witness statements and a supplemental police report, in violation of Brady v. Maryland, 373 U.S. 83 (1963), and its progeny. After an evidentiary hearing, the state district granted petitioner relief,[17] and the Louisiana Fourth Circuit

_____

[16]  State v. Sholes, 782 So.2d 691, 693-94 (La. App. 4th Cir. 2001) (No. 99-KA-2414); State Rec., Vol. II of IV.

[17]  State Rec., Vol. III of IV, transcript of January 31, 2005, pp. 6-7; State Rec., Vol. III of IV, minute entry dated January 31, 2005.

Court of Appeal found that "the trial court did not abuse its discretion in granting the defendant's post conviction relief."[18]  However, the Louisiana Supreme Court subsequently vacated the judgment granting relief and reinstated petitioner's conviction and sentence, holding:

> All three witnesses positively identified relator from a photographic lineup and at trial as the man they saw after the gunshot that claimed the victim's life was fired.  Against this backdrop, and given the overall consistency of the witnesses' statements and trial testimony, the slight inaccuracies in the witnesses' description of relator's physical characteristics, and the omission of some narrative details offered by their trial testimony from their prior statements to the police, do not rise to a level of materiality warranting reversal under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and its progeny.  See, e.g., State v. Marshall, 81-3115, p. 16 (La. 9/5/95), 660 So.2d 819 ("Evidence is material [and reversal warranted] only if it is reasonably probable that the result of the proceeding would have been different had the evidence been disclosed to the defense.  A reasonable probability is one which is sufficient to undermine confidence in the outcome.").[19]

The AEDPA places severe limitations on this Court's review of the Louisiana Supreme Court's decision rejecting petitioner's Brady claim.  The United States Fifth Circuit Court of Appeals has cautioned:

> Under AEDPA, [a federal court] do[es] not decide *de novo* whether a state prisoner has sufficiently proven a Brady violation.  See Yarborough v. Alvarado, 541 U.S. 652, 665, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) ("We cannot grant relief under AEDPA by conducting our own independent inquiry into whether the state court was correct as a de novo matter."); Neal v. Puckett, 286 F.3d 230, 236 (5th Cir. 2002) (en banc) ("We have no authority to grant habeas corpus relief simply because we conclude, in our independent

---

[18]  State v. Sholes, No. 2005-K-0329 (La. App. 4th Cir. Apr. 20, 2005) (unpublished); State Rec., Vol. III of IV.

[19]  State v. Sholes, 920 So.2d 212 (La. 2006) (No. 2005-KP-1290).

> judgment, that a state supreme court's application of [federal law] is erroneous or incorrect."). Rather, [a federal court] decide[s] whether the state court's <u>Brady</u> determination resulted in a decision that is contrary to, or involved an unreasonable application of, clearly established federal law. <u>Busby v. Dretke</u>, 359 F.3d 708, 717 (5th Cir. 2004).

<u>Dickson v. Quarterman</u>, 462 F.3d 470, 477-78 (5th Cir. 2006).[20]

The federal law regarding <u>Brady</u> claims is clear.  The United States Supreme Court has held:

> A <u>Brady</u> violation occurs when the government fails to disclose evidence materially favorable to the accused. This Court has held that the <u>Brady</u> duty extends to impeachment evidence as well as exculpatory evidence, and <u>Brady</u> suppression occurs when the government fails to turn over even evidence that is known only to police investigators and not to the prosecutor.

<u>Youngblood v. West Virginia</u>, 126 S.Ct. 2188, 2190 (2006) (per curiam) (internal citations and quotation marks omitted).

Therefore, the first question is whether the state actually failed to disclose the disputed evidence.  Although the state half-heartedly argues that petitioner has never established that

---

[20]  At the oral argument held in this case, petitioner's counsel faulted the Louisiana Supreme Court for mentioning only <u>Brady</u> and not also expressly citing cases which extended <u>Brady</u>, such as <u>Giglio v. United States</u>, 405 U.S. 150 (1972) and <u>United States v. Bagley</u>, 473 U.S. 667 (1985). However, the Louisiana Supreme Court referred to <u>Brady</u> "and its progeny," a reference which obviously included such cases.  Moreover, in any event, a state court decision is entitled to deference under the AEDPA regardless of whether the state court cites any authority at all.  This Court looks only to the state court's "ultimate legal conclusion," not its reasoning or citations.  See <u>Neal v. Puckett</u>, 286 F.3d 230, 246 (5th Cir. 2002) ("[A] federal habeas court is authorized by Section 2254(d) to review only a state court's 'decision,' and not the written opinion explaining that decision."); <u>Santellan v. Cockrell</u>, 271 F.3d 190, 193 (5th Cir. 2001).

the witness statements were withheld,[21] this Court rejects that contention. At the evidentiary hearing held on the <u>Brady</u> claim, petitioner's trial counsel testified under oath that the disputed evidence was not given to the defense,[22] and the state produced no witnesses to refute that testimony. Further, in the arguments following the evidentiary hearing, the state did not argue that the evidence was given to the defense,[23] and none of the state courts reviewing the <u>Brady</u> claim found that the disputed evidence had been produced. There is simply no basis for this Court to find that the evidence was in fact provided to the defense.

Accordingly, this Court must proceed to the second prong of the inquiry, i.e. whether the withheld evidence was "*materially* favorable to the accused." <u>Youngblood</u>, 126 S.Ct. at 2190 (emphasis added). With respect to that issue, it must be remembered that it is not enough that the evidence might have been *helpful* to the defense. <u>See, e.g.</u>, <u>Kyles v. Whitley</u>, 514 U.S. 419, 436-37 (1995) ("[T]he Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense."). Rather, the withheld evidence must have been "material" in the constitutional sense. On that point, the United States Supreme Court has held:

> Such evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different, although a showing of materiality does not require demonstration by a preponderance that

---

[21]   Rec. Doc. 5, p. 10.

[22]   State Rec., Vol. III of IV, transcript of November 23, 2004, pp. 5, 7-10, and 12.

[23]   The arguments were held on January 5, 2005. State Rec., Vol. III of IV, transcript of January 5, 2005.

> disclosure of the suppressed evidence would have resulted ultimately
> in the defendant's acquittal.  The reversal of a conviction is required
> upon a showing that the favorable evidence could reasonably be
> taken to put the whole case in such a different light as to undermine
> confidence in the verdict.

Youngblood, 126 S.Ct. at 2190.  For the following reasons, the Court concludes that the evidence

withheld here, even when considered cumulatively,[24] simply does not rise to that level.

Petitioner first argues that the state improperly withheld a prior inconsistent statement

given by Tyrone Jones.  At trial, Jones testified as follows regarding the events immediately

preceding the shooting:

> Q    What were y'all doing when you got back to the house that
>      night?
>
> A    When we made it back to the house, I like parked my car on
>      the side the house there's a lot there.  We sit on the car and
>      we was talking.
>
> Q    While y'all were sitting there talking, did anything happen?
>
> A    No.  Nothing didn't happen.  We was asked, you know, where
>      is Eric was, you know, and you know – (sic)
>
> Q.   Okay.  Who asked where Eric was?
>
> A    I just know him by his name is Greg.  I never knew his name.
>
> Q    Okay.  And what happened then?
>
> A    We just sit on the car.  There were two males and one female
>      was on the other side of the fence talking, too.  Cause we was
>      sitting on the car.  And then he just like approached us and

---

[24] Although undisclosed evidence is necessarily discussed item by item, it must ultimately be
considered collectively when assessing a Brady claim.  Kyles v. Whitley, 514 U.S. 419, 436 (1995).

asked us where he was.  We said he was in the house.  And he just went in the house.[25]

In his prior statement, Jones had said:

Uh ... sir me and my friend just pulled up from taking a ride.  And, um ... we parked and sit on top of the car, me and my friend DoDo.  And we was talking, and there was a male, two males matter of fact, and a female was on the other side of the gate, talking.  Me and DoDo was sitting on the car, we heard a pop come on, and DoDo ran inside the house, and he ran out.  He say, his brother been shot.  And um ... my nerves got bad and um ... I stepped in the house and I just seen him laying there, and I ran out the house, and everything.  My nerves just got so bad ....[26]

That prior statement does not qualify as exculpatory or impeachment evidence.  Clearly, it in no way exculpates petitioner.  Further, it could have been used to impeach Jones only if he had testified in a manner inconsistent with the statement. Petitioner argues that the prior statement is inconsistent because it "contradicts" Jones' trial testimony that he spoke to petitioner before he entered the residence.  It does not.  While it is true that Jones does not say in the statement that he saw or spoke to petitioner prior to the shooting, he also does not state the contrary.  The statement is *silent* as to whether or not Jones saw or spoke to petitioner at that time.  Petitioner strains to infer from that silence that it must not have occurred or Jones necessarily would have mentioned it in the statement; however, that simply infers too much.  Accordingly, the Court finds that the statement is not inconsistent and could not have been used for impeachment purposes.

---

[25]  State Rec., Vol. III of IV, transcript of November 12, 1998, p. 32.

[26]  State Rec., Vol. III of IV, undated statement of Tyrone Jones, p. 1.

Petitioner also argues that Jones' statement, as well as the statement of Warren McKay, should have been produced because that evidence contained references to other individuals who might have been witnesses.  However, those individuals were never identified and played no part in the investigation or prosecution of this case.  Accordingly, any contention that those individuals could have provided *exculpatory* information is purely speculative, and Brady did not require the prosecution to release information regarding such non-testifying witnesses.  Wheaton v. Roe, 101 Fed. App'x 648, 649 (9th Cir. 2004); Watson v. Cain, Civ. Action No. 06-613, 2007 WL 1455978, at *8 (E.D. La. May 17, 2007).

Petitioner next argues that the state withheld a prior inconsistent statement given by Gerald Gillard.  At trial, Gillard testified as follows regarding the events immediately after the shooting:

> Q       Okay.  And, Mr. Gillard, did anything unusual occur on September 3rd, 1997?
>
> A.      Yes, sir.  I think about 8:30, 9 o'clock, I was sleeping.  And I heard a shot.  It woke me up.  And I was getting out my bed.  I go –
>
> ....
>
> Q       All right.  And what woke you up?
>
> A       A shot.
>
> Q       Okay.  And when you woke up, what did you observe?
>
> A       As I was getting up, I observed a guy walking out the room.  And so I was just staring.  I didn't get out the bed.  I was on

- 13 -

> my hands and knees.  And he stopped and looked at me.  And
> --[27]

Petitioner contrasts that testimony with Gillard's prior statement, in which he described the event as follows:

> Q:    Would you relate to me in your own words your knowledge of the events surrounding the shooting death of Walter McKay.
>
> A:    I was sleeping I heard a shot, I woke up and I looked out the room door and I seen this guy walking thru the hallway into the living room and out of the front door.[28]

On that point, the statement does not qualify as either exculpatory or impeachment evidence.  It in no way exculpates petitioner; rather, it is clearly inculpatory.  Further, it could not be used to impeach Gillard because it is not inconsistent with his trial testimony.  Petitioner argues that the statement is inconsistent because it makes no mention of him allegedly looking at Gillard.  However, once again, the statement is simply silent on that point, and that silence in no way supports an inference that petitioner and Gillard did *not* look at one another after the shooting.

Gillard also testified that he knew petitioner:

> Q    Did you know the defendant, Mr. Sholes?
>
> A    Yes, sir.  Yes, sir.  Because the defendant stayed with me for a month or two.  I gave him a place to stay.
>
> Q    Okay.

---

[27]  State Rec., Vol. III of IV, transcript of November 12, 1998, pp. 36-37.

[28]  State Rec., Vol. III of IV, statement of Gerald Gillard dated September 3, 1997, p. 1.

A        Before that happened.[29]

However, in the prior statement, Gillard said that he did not know the last name of "Greg"[30] and that, to Gillard's knowledge, "Greg" had never been in the residence prior to the shooting.[31]

Again, this portion of the statement is not exculpatory. Arguably, however, it might have qualified as impeachment evidence. Petitioner essentially argues that if two had lived together for a time, Gillard surely would have known petitioner's name and that he had previously been in the residence. Neither of those conclusions in unassailable. It is not beyond the realm of possibility that the two could have shared a lodging without Gillard being aware of petitioner's surname. Further, it is not at all clear that the residence where the shooting occurred was the *same* residence the two shared; if not, then there is no inconsistency as to whether Gillard was aware if petitioner had previously been present at the location of the shooting.

Nevertheless, even if the prior statement is inconsistent and could have been used to impeach Gillard, it cannot be considered "material" in the constitutional sense. As noted, evidence is considered "material" only "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different"; that is, the evidence must be such that it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Youngblood, 126 S.Ct. at 2190. This evidence clearly does not rise to that level. Even if Gillard's testimony had been impeached and he was

---

[29]  State Rec., Vol. III of IV, transcript of November 12, 1998, p. 39.

[30]  State Rec., Vol. III of IV, statement of Gerald Gillard dated September 3, 1997, p. 1.

[31]  State Rec., Vol. III of IV, statement of Gerald Gillard dated September 3, 1997, p. 2.

entirely discredited, his testimony was in no way crucial to petitioner's conviction.  Gillard did not

see the shooting.  The only relevance of his testimony is that it placed petitioner in the residence

immediately after the shooting; however, that fact was also established through the eyewitness

testimony of both Jones and McKay.  Accordingly, Gillard's testimony was, at best, merely

cumulative.  Accordingly, the evidence in question cannot be considered "material":

> The materiality of <u>Brady</u> evidence depends almost entirely on the
> value of the evidence relative to the other evidence mustered by the
> State.  When the testimony of a witness who might have been
> impeached is strongly corroborated by additional evidence supporting
> a guilty verdict, the undisclosed evidence is generally not found to be
> material.  Similarly, when the undisclosed evidence is merely
> cumulative of other evidence, no <u>Brady</u> violation occurs.

<u>Spence v. Johnson</u>, 80 F.3d 989, 995 (5th Cir. 1996) (textual alterations, quotation marks, and

citations omitted).[32]

Petitioner next argues that the state withheld a prior inconsistent statement given by

Warren McKay.  At trial, McKay testified as follows:

BY THE WITNESS:

> We were talking in the parking lot.  We talked for a
> good while.  And a black car had done pulled up,
> asked me – someone, a friend of mine, had asked me
> something.  I had turned to look at him.  But, you
> know, I seen the car.  And he drove off.  And that's
> when Tyrone went into the house – not Tyrone, Kevin

---

[32] At points in the discussion of the <u>Brady</u> claim, petitioner's counsel mentions information,
allegedly from Gillard, which is contained in the *initial* police incident report.  However, there is
no contention that the initial police report was withheld; additionally, at the evidentiary hearing, trial
counsel expressly admitted that he was given that report.  State Rec., Vol. III of IV, transcript of
November 23, 2004, at pp. 9-10.  Accordingly, the initial report has no relevance to the <u>Brady</u> claim
in this case.

> Shaw (spelled phonetically) had supposed to have
> went in the house.  But I didn't –
>
> EXAMINATION BY MR. COMEAUX [the prosecutor]:
>
> Q      Now, did you see him go into the house?
>
> A      No, sir.  I haven't.[33]

The issue was revisited on cross-examination, at which time McKay testified:

> Q      ... [I]t's your testimony that you did not see Kevin Sholes go
>        into that house; is that correct?
>
> A      Yes, sir.
>
> Q      And it's your testimony that he did not stop and talk to you at
>        all before going into the apartment.
>
> A      I heard someone asking was my little brother inside.  I didn't
>        turn to see.  It was Tyrone who told me that it was Greg
>        asking the question.
>
> Q      So other than somebody else telling you that, you didn't hear
>        – you didn't see Mr. Sholes stop and talk to you?
>
> A      No. ...[34]

Petitioner argues that this testimony varies from McKay's prior statement, in which he said:

> A.      ... Tyrone and I was riding around for good while, and I came
>         back home by my brother, which is my grandmothers house,
>         where he stood.  Came there, and my brother came outside,
>         and he said DoDo, got some Pizza inside, I say all right.  I
>         told Tyrone come on.  Went inside, got a Pizza, we took a
>         piece, we sat down for about a minute, got up and walk back
>         outside.  Stood outside, back in the parking lot talking, before

---

[33]  State Rec., Vol. III of IV, transcript of November 12, 1998, p. 44.

[34]  State Rec., Vol. III of IV, transcript of November 12, 1998, p. 54.

> he went home.  We talk for about 5, 5 to 10 minutes, and I
> heard a bang, my brother yelled.  I went inside ... trying to get
> inside.  Greg came out and said, DoDo, your brother shot his
> self ...[35]

Petitioner argues that the testimony is also inconsistent with the following excerpt from the

statement:

> Q.      Could Greg have come in through the back door, by the
>         kitchen?
>
> A.      Yeah all that's open.  All that's rotten, everything back there
>         is suppose to get torn down.
>
> Q.      So Greg could have come in that way without you knowing,
>         through the back door.
>
> A.      Yeah, I didn't see him go in through the front, cause I was
>         right there in the parking lot, I didn't see him.[36]

Petitioner argues that the statement is important because it makes no reference to him allegedly

talking to Tyrone Jones before entering the house, which is how McKay placed petitioner at the

scene *prior* to the shooting.  He further argues that the statement also shows that McKay did know

how petitioner allegedly entered the house.

    As to those issues, the Court again rejects any contention that the prior statement was

either exculpatory or impeachment evidence.  It clearly in no way exculpated petitioner.  Further,

again, it is not inconsistent with the trial testimony.  Although the statement does not mention the

conversation between petitioner and Jones, it is simply silent on that point.  Once again, that silence

---

[35]  State Rec., Vol. III of IV, statement of Warren McKay dated September 4, 1997, pp. 1-2.

[36]  State Rec., Vol. III of IV, statement of Warren McKay dated September 4, 1997, p. 4.

does not give rise to an inference that no such conversation occurred.  Moreover, the statement clearly in not inconsistent regarding whether McKay saw petitioner enter the house.  Both in his testimony and the statement, McKay said that he did not see petitioner enter the residence; accordingly, he could not have known which entrance was used.

Although it is not entirely clear why, petitioner also highlights what he perceives are inconsistencies regarding the victim's drug sales and proceeds.  On direct examination, McKay testified:

Q      Was he [the victim] [a] drug dealer?

A      Yes.

Q      Did your brother have money?

A      Excuse me.

Q      Did your brother keep money in the room?

A      Yes, he have.

Q      And where would he keep that money?

A      He would keep money in the ceiling.  Also, he would keep it under the mattress.

Q      And how much money would he typically keep?

A      Exactly about 7,000 or either 10,000.

Q      Did – you knew about it.  Did other people know about this?

A      Yes.  Everyone knew.  Everyone in the neighborhood knew. Because when they'd come over and get anything from him, you know, he'd just give change out of what he have, give 'em what they want.

Q       They'd see him come in and get the money from the
        mattress?

A       Yeah.  They'd go directly in the room with him.

Q       Did you ever warn him about this?

A       Yes.  That's the reason why I left my job.  Because a friend
        which he was getting it from, someone tried to kidnap him.
        My brother went right behind him, trying to help him.  When
        they came back, they never told me what happened, what was
        going on.  And I told Eric, just leave it alone.  Whatever you
        got, just bring it to mama.  Give mama your money.  But he
        didn't want to stop right there.  Because he wanted to buy the
        guy's car.  And he'd go to Baton Rouge to be with his baby's
        mother.[37]

On cross-examination, McKay reiterated that point and testified that money was missing after the

shooting:

Q       It's your testimony that money was missing, that everybody
        knew about that money; is that correct?

A       Yes.

Q       It's common knowledge in the community?

A       Excuse me.

Q       It's common knowledge that he kept money in there?

A       Yes.

Q       Large sums of money?

A       Yes, sir.[38]

_____

[37]  State Rec., Vol. III of IV, transcript of November 12, 1998, pp. 47-48.

[38]  State Rec., Vol. III of IV, transcript of November 12, 1998, p. 55.

Petitioner contrasts that testimony with McKay's prior statement, in which he indicated that approximately $500 to $700 was missing from the mattress.[39]  However, this statement is neither exculpatory nor inconsistent so as to be useful for impeachment purposes.[40]

Petitioner next notes that McKay testified that he did not know that the real name of "Greg" was Kevin Sholes.[41]  Petitioner contrasts that testimony with the following excerpt from McKay's statement:

> Q.   Okay, which uh ... is Greg, is his name Greg, or Gregory, you know?
>
> A.   Everyone refer to him as Greg, and just call him Greg.  I don't know his last name.[42]

Again, on this point, this statement is neither exculpatory nor inconsistent so as to be useful for impeachment purposes.

Lastly, petitioner argues that McKay gave a "questionable" description of petitioner in the statement:

> Q.   ... [H]ow tall is he about?

---

[39]  State Rec., Vol. III of IV, statement of Warren McKay dated September 4, 1997, p. 8.

[40]  Petitioner's counsel contends that McKay testified at trial that a significantly greater amount of money was missing than indicated in the pretrial statement.  That is incorrect.  Although he testified that the victim typically kept $7,000 - 10,000 in the room, McKay did not expressly speculate in his testimony as to how much of that typical amount might have been missing after the killing.

[41]  State Rec., Vol. III of IV, transcript of November 12, 1998, p. 51.

[42]  State Rec., Vol. III of IV, statement of Warren McKay dated September 4, 1997, p. 4.

A. Greg is about ... Greg is about ... 6'3, Greg is about right here to me ... (inaudible)

Q. So it be 6 even, would you say?

A. I'd say about 6 even.

Q. About 6 even?

A. About 5'9, or 5'8.

Q. How much does Greg weight [sic]?

A. Greg about 200 or about 230.

Q. So he's heavy build?

A. Heavy stocky, he has a limp, he walk with a limp ... like he's bowlegged.[43]

Again, this evidence is not exculpatory.  Further, even if the allegedly inaccurate estimates of petitioner's height and weight[44] could somehow be considered impeachment evidence, which the Court doubts under the facts this case, it clearly is not "material."  This is not an instance where an eyewitness has given a description of an *unknown* perpetrator which proves inconsistent with the physical characteristics of the person subsequently prosecuted.  Rather, McKay already *knew* petitioner.  The fact that McKay may be poor at estimating heights and weights in no way

---

[43] State Rec., Vol. III of IV, statement of Warren McKay dated September 4, 1997, p. 4.

[44] It is not evident that the estimated height and weight is as far off as petitioner's counsel suggests.  *Habeas* counsel contends that, at the time of the shooting, petitioner "stood 5'7" and weighed well under 200 pounds."  Rec. Doc. 1, supporting memorandum, p. 26.  However, there is no evidence in the record supporting that contention.  Rather, in the supplemental police report which was prepared on September 10, 1997, some six days *after* petitioner's arrest, he is listed as being 6 feet tall and weighing 200 pounds.

undercuts his identification based on that prior acquaintance or puts the whole case in such a different light as to undermine confidence in the verdict.[45]

Lastly, petitioner notes that the withheld supplemental police report revealed that it was Officer Ron Edwards who informed the investigators that petitioner used the alias "Greg" and so might be the killer.  However, that information is not exculpatory, nor could it have been used for impeachment purposes.  It was clear at trial that the witnesses knew petitioner only by his alias.[46] However, knowledge of petitioner's real name was not required for the witnesses to recognize him or his photograph, and ignorance of his name in no way affected the reliability of the identification. The fact that it was Edwards who made the connection between the alias and petitioner is simply immaterial and certainly does not put the whole case in such a different light as to undermine confidence in the verdict.[47]

In summary, this Court has carefully considered petitioner's Brady claim as set forth in his petition and as ably explained by his counsel at the oral argument held in this case. Nevertheless,  even if this Court were allowed to conduct a *de novo* review, which as noted it is not,

---

[45]  At oral argument, petitioner's counsel contended that the instant case is factually similar to and controlled by Kyles v. Whitley, 514 U.S. 419 (1995), which also involved prior statements which recorded physical descriptions not matching the accused.  This Court rejects that argument. The accused in Kyles was a stranger to the witnesses; therefore, his identification was inherently more suspect.  Under those facts, it is obvious that the prior inconsistent descriptions were far more crucial to the defense strategy contending that the wrong man had been identified and prosecuted.

[46]  State Rec., Vol. III of IV, transcript of November 23, 2004, pp. 20, 22, 32, and 51.

[47]  Moreover, although the supplemental police report was withheld, defense counsel was nevertheless aware that it was a police officer who suggested that petitioner might be "Greg," as that fact was discussed at the pretrial hearings in this case.  State Rec., Vol. II of IV, transcript of September 17, 1997, pp. 4-5, and transcript of March 18, 1998, p. 6.

it is evident that there simply has been no <u>Brady</u> violation.  While the withheld documents might have been helpful to the defense or provided fodder for cross-examination, and while a more forthcoming prosecution team might have disclosed the statements or allowed "open file" discovery, those facts are insufficient to state a <u>Brady</u> claim or to  warrant *habeas corpus* relief.

In summary, petitioner simply has not demonstrated that the Louisiana Supreme Court's decision rejecting his <u>Brady</u> claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Accordingly, applying the AEDPA's deferential standard, this Court likewise rejects that claim.

<u>Ineffective Assistance of Counsel</u>

Petitioner next claims that his trial counsel was ineffective in several respects.  In <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), the United States Supreme Court established a two-prong test for evaluating claims of ineffective assistance of counsel.  A petitioner seeking relief must demonstrate that counsel's performance was deficient *and* that the deficient performance prejudiced his defense.  <u>See</u> <u>id</u>. at 697.

To prevail on the deficiency prong, petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment.  <u>See</u> <u>Styron v. Johnson</u>, 262 F.3d 438, 450 (5th Cir. 2001).  "Counsel's performance is deficient if it falls below an objective standard of reasonableness."  <u>Little v. Johnson</u>, 162 F.3d 855, 860 (5th Cir. 1998). Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances.  <u>See</u> <u>Strickland</u>, 466 U.S. at 689.  "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's

conduct.'"  Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting Strickland, 466 U.S. at 690).

Petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide

range of reasonable representation.  See Crockett v. McCotter, 796 F.2d 787, 791 (5th Cir. 1986);

Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

       In order to prove prejudice with respect to trial counsel, petitioner "must show that

there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different."  Strickland, 466 U.S. at 694.  In this context, a reasonable

probability is "a probability sufficient to undermine confidence in the outcome."  Id.  In making a

determination as to whether prejudice occurred, courts must review the record to determine "the

relative role that the alleged trial errors played in the total context of [the] trial."  Crockett, 796 F.2d

at 793.

       Petitioner bears the burden of proof when asserting an ineffective assistance of

counsel claim.  Petitioner "must demonstrate, by a preponderance of the evidence, that his counsel

was ineffective."  Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1993); see also Clark v. Johnson,

227 F.3d 273, 284 (5th Cir. 2000).  If a court finds that petitioner has made an insufficient showing

as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may

dispose of the claim without addressing the other prong.  Strickland, 466 U.S. at 697.

       A claim of ineffective assistance of counsel is a mixed question of law and fact.

Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002). Therefore, this Court must defer to the state

court on such claims unless the state court's decision "was contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

Petitioner first claims that his counsel refused to allow him to testify in his own defense.  "[I]t cannot be doubted that a defendant in a criminal case has the right to take the witness stand and to testify in his or her own defense."  Rock v. Arkansas, 483 U.S. 44, 49 (1987). However, petitioner has offered no proof whatsoever that counsel in fact prevented him from testifying.

Petitioner does not allege and the record does not suggest that petitioner ever made known to the trial court that his counsel was refusing to allow him to testify despite his stated desire to do so.  Of course, the mere fact that petitioner failed to stand up in open court and insist on testifying should not be dispositive of the issue.  See United States v. Mullins, 315 F.3d 449, 455 (5th Cir. 2002); see also United States v. Araujo, 77 Fed. App'x 276 (5th Cir. 2003).  Nevertheless, the Court cannot ignore the fact that petitioner has never presented any evidence whatsoever either to the state courts or to this Court to corroborate his allegations.  Without more, petitioner's bare allegations are insufficient to trigger either the granting of relief or further fact-finding by this Court. As the United States Seventh Circuit Court of Appeals noted in a case in which a petitioner alleged that he had been denied the right to testify by his counsel:

> There is grave practical difficulty in establishing a mechanism that will protect a criminal defendant's personal right (that is, a right not waivable by counsel) to testify on his own behalf without rendering the criminal process unworkable.  It is extremely common for criminal defendants not to testify, and there are good reasons for this, as we have seen.  Yet it is simple enough after being convicted for the defendant to say, "My lawyer wouldn't let me testify. Therefore I'm entitled to a new trial." ...

> ... [A] barebones assertion by a defendant, albeit made under oath, is insufficient to require a hearing or other action on his claim that his right to testify in his own defense was denied him.  It just is too facile a tactic to be allowed to succeed.  Some greater particularity is necessary – and also we think some substantiation is necessary, such as an affidavit from the lawyer who allegedly forbade his client to testify – to give the claim sufficient credibility to warrant a further investment of judicial resources in determining the truth of the claim.

Underwood v. Clark, 939 F.2d 473, 475-76 (7th Cir. 1991); see also Turcios v. Dretke, No. Civ. A. H-97-0515, 2005 WL 3263918 (S.D. Tex. Nov. 29, 2005).  This Court finds that, in light of the complete lack of evidentiary support for petitioner's contention, he has failed to meet his burden to establish that he is entitled to relief.[48]

To the extent that petitioner is alleging that his counsel was ineffective in failing to have him testify, the Court likewise rejects that claim.   A decision whether to put a criminal defendant on the stand "is a 'judgment call' which should not easily be condemned with the benefit of hindsight."  United States v. Garcia, 762 F.2d 1222, 1226 (5th Cir. 1985); see also United States v. Mullins, 315 F.3d 449, 453 (5th Cir. 2002).  There is certainly no basis for such second-guessing in this case, where petitioner "fails to specify what the content of testimony would have been and fails to show that it is reasonably probable that his testimony would have changed the result of his proceeding."  Dillon v. Cain, Civ. Action No. 05-3760, 2007 WL 1573809, at *5 (E.D. La. May 25, 2007).

---

[48]    The Court notes that the lack of evidentiary support for this claim is particularly telling in light of the fact that the state court held an evidentiary hearing on petitioner's post-conviction claims. Despite the fact that petitioner's trial counsel testified at that hearing, he was not even asked any questions regarding petitioner's failure to take the stand at trial.

Petitioner next claims that his counsel was ineffective in failing to highlight the fact that the victim was a drug-dealer known to keep large sums of cash in his home, a fact that could have served as a motive for others to commit the murder. That contention is without merit. The victim's criminal activities and store of cash were in fact fully explored at trial, both on direct and cross examination, and clearly established.[49] It is unclear what more petitioner feels trial counsel should have done with respect to that issue.[50]

---

[49] State Rec., Vol. III of IV, transcript of November 12, 1998, pp. 21, 24-25, 39-40, 47-48, and 55.

[50] In the state post-conviction proceedings, the trial judge noted that this claim was particularly unavailing, a point which petitioner's counsel then essentially conceded:

> BY THE COURT:
> I don't have the closing arguments in what was presented to me to read, but he [trial counsel] raised that. He questioned every witness, starting with the officer, as to the issue of the victim being a drug dealer; the victim having significant sums of money in the house. And with one of those witnesses, which is the uncle who lived at the house, the fact that the victim also had drugs in the house. I don't think he necessarily raised that particular point of actual drugs being in the house with any of the other witnesses. But as far as being a drug dealer, he raised that with every witness. Now, I guess "assume" may be a bad word to use. But without having the transcript of his closing argument before me, I would have to think that he raised that in the closing argument too, that the victim was a drug dealer. That seems to be part and parcel of what he was presenting as a defense, that some other person did it, and did it because of the fact that the victim was a drug dealer.
>
> BY MS. TOWN [petitioner's counsel]:
> I agree with that, Your Honor. ...

State Rec., Vol. III of IV, transcript of January 5, 2005, pp. 5-6. This Court notes that a transcript of the closing argument is not in the record or attached to petitioner's federal application.

Petitioner next claims that his counsel was ineffective in failing to call petitioner's girlfriend, Kendra Reed, as an alibi witness.  At the evidentiary hearing held on this claim in state court, Reed testified as follows:

> Q    Miss Reed, do you know an Archie Creech?
>
> A    That was his [petitioner's] second lawyer, because he had a lady at first.
>
> Q    Did you ever speak to Mr. Creech prior to Kevin's trial?
>
> A    Yes, I did.
>
> Q    And what did you speak to Mr. Creech about?
>
> A    I told him that the night that the incident was supposed to have happened, that Kevin was at my house.  He told me that if he needed me, that he would contact me.  I never heard anything from him.  I never spoke to him again.  The next thing I knew, Kevin had done got life.  And his family was mad at me, 'cause they thought that, you know, I didn't try to come forward, or try to help him, you know, as far as his situation.  But that wasn't the case, because I did come forward at the time.[51]

On cross-examination, she testified:

> Q    Okay.  And you never came forward before today, before the trial, and told the police that he was with you?  You never told the District Attorney's office in the years that it took to get to trial.  You never told anybody that he was with you?
>
> A    I spoke to Archie.  And I was coming to court on a regular basis.  So, you know, I was seen.  And I was known of.
>
> Q    But you never told the police?  You never told the District Attorneys?

---

[51]  State Rec., Vol. III of IV, transcript of November 23, 2004, p. 16.

A      I wasn't there – well, the place where it happened at, I wasn't there.  So I couldn't talk to the police.

Q      You never called them?  You never called the District Attorneys.  You never made any attempt to contact anybody else prior to trial, correct?

A      Correct.  I didn't speak to any police or anything.  No.[52]

Creech testified, however, that he had no recollection of even speaking with Reed:

Q      And as a result of your defense, did you ever consider or were you approached by an alibi witness, to provide an alibi defense for your client, or do you recall?

A      I do not recall that, but I'm not saying it didn't happen.  It's just that alibi was never, ever a defense in this case.  Based upon my conversations with my client at the very beginning, that was never a defense for us, ever.

Q      And if you were approached by an alibi witness by the name of Kendra Reed, would you recall that?

A      I think I would have made note of it.

Q      Did you have a note in your file?

A      I have nothing showing I was approached by Kendra Reed.  And it may have been that I didn't find her believable based upon my previous conversations, but I don't know.  I don't have any recollection of her in my file.

Q      It was your choice not to use an alibi defense; is that correct?

A      Well, I think I discussed it with Mr. Sholes.  I would have run that by him, giving him my reasons for not doing it.[53]

---

[52]  State Rec., Vol. III of IV, transcript of November 23, 2004, p. 17.

[53]  State Rec., Vol. III of IV, transcript of November 23, 2004, p. 13.

Even if it is assumed that Reed did speak to Creech, a fact which has *not* been clearly established, he noted that any decision not to call her to testify would have been a strategic one. Indeed, there is a strong presumption that counsel's decision regarding whether to call a witness is one of trial strategy. Murray v. Maggio, 736 F.2d 279, 282 (5th Cir. 1984); see also Green v. Cockrell, No. 02-20650, 2003 WL 21145722 , at *2 (5th Cir. Apr. 29, 2003) ("A strategic or tactical decision not to call particular witnesses does not constitute ineffective assistance."); Buckelew v. United States, 575 F.2d 515, 521 (5th Cir. 1978) ("[C]omplaints based upon uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative."). The United States Supreme Court has cautioned courts not to second-guess counsel's decisions on matters of trial tactics through the distorting lens of hindsight; rather, courts are to employ a strong presumption that counsel's conduct falls within a wide range of reasonable assistance and, under the circumstances, might be considered sound trial strategy. Strickland, 466 U.S. at 689.

That presumption is particularly applicable in instances such as this. As the United States First Circuit Court of Appeals has noted:

> The decision whether to call a particular witness is almost always strategic, requiring a balancing of the benefits and risks of the anticipated testimony. The witness may not testify as anticipated or the witness's demeanor or character may impress the jury unfavorably and taint the jury's perceptions of the accused; or the testimony, though sympathetic, may prompt jurors to draw inferences unfavorable to the accused. Where the prosecution's case is less than compelling ..., the risk of "rocking the boat" may warrant a decision by trial counsel to forego the presentation of further defense testimony, even favorable testimony. Johnson v. Lockhart, 921 F.2d 796, 800 (8th Cir.1990) ("since the government has the burden of proving guilt beyond a reasonable doubt, it may not be necessary for

> the defense to introduce evidence to meet the constitutional requirement of effective representation"); cf. [United States v.] Natanel, 938 F.2d [302, 310 (1ˢᵗ Cir. 1991)] ("additional arguments could only impair [a] client's seemingly secure position....   In litigation, as in life, there is much to be said for such maxims as 'if it ain't broke, don't fix it,' and 'quit when you're ahead'").

Lema v. United States, 987 F.2d 48, 54 (1ˢᵗ Cir. 1993) (citations omitted).  The court continued:

> Reasonably competent trial counsel might well have determined that the best prospect for acquittal lay in discrediting the government's witnesses, rather than presenting additional testimony which could appear to legitimate the government's case or raise questions about the defense not previously suggested by the government's evidence.

Id.  As petitioner has repeatedly contended in his federal application, the evidence against him was hardly conclusive, in that no one actually saw the shooting and there was no physical evidence connecting him to the crime.  Under those circumstances, counsel simply cannot be considered deficient in opting simply to try to discredit the state's case rather than taking the chance of alienating the jury by presenting the questionable testimony of the accused's girlfriend as the sole, inherently suspect "alibi" witness.

Petitioner next faults trial counsel for not obtaining the witness statements and the supplemental police report.  However, that is the same evidence which petitioner previously argued was wrongly withheld from the defense despite discovery requests.  Petitioner cannot have it both ways.  Having already acknowledged in the application that such evidence was in fact requested[54] and purposely withheld, he cannot now argue and demonstrate that counsel was deficient in failing to obtain that evidence.

---

[54]  Rec. Doc. 1, supporting memorandum, p. 22, n.9.

It is also argued that counsel was ineffective in failing to call Officer Ron Edwards to testify.  As noted previously, the eyewitnesses knew petitioner only as "Greg," and it was Edwards who told the investigating officers that "Greg" was an alias used by petitioner and suggested that he might be the suspect they were seeking.  That lead turned out to be accurate, and the witnesses were able to confirm that petitioner was in fact the person they knew as "Greg" and who they saw leaving the residence immediately after the shooting.  It is unclear what benefit petitioner believes would have been gained by calling Edwards, who did nothing more than furnish the investigating officers with a possible lead.  Even if there was some animosity between Edwards and petitioner, a fact that has not been established, that would be of no consequence.  The fact remains that the eyewitnesses independently identified petitioner as "Greg."  Petitioner has made no showing that counsel performed deficiently in failing to call Edwards to testify or that petitioner was prejudiced as a result.

Petitioner also complains that trial counsel did not effectively cross-examine witnesses on points allegedly beneficial to the defense, such as other entrances to the house and disparities concerning petitioner's description.  "The decision whether to cross-examine a witness, and if so, how vigorously to challenge the witness' testimony, requires a quintessential exercise of professional judgment."  Ford v. Cockrell, 315 F.Supp.2d 831, 859 (W.D. Tex. 2004), aff'd, 135 Fed. App'x 769 (5th Cir. 2005), cert. denied, 546 U.S. 1098 (2006).  Again, the United States Supreme Court has cautioned courts not to second-guess counsel's decisions on such matters through the distorting lens of hindsight; rather, courts are to employ a strong presumption that counsel's conduct falls within a wide range of reasonable assistance and, under the circumstances,

might be considered sound trial strategy.  <u>Strickland</u>, 466 U.S. at 689.  Moreover, it is irrelevant that

*habeas* counsel indicates that she would have made other choices or handled such issues differently.

As the Supreme Court noted:  "There are countless ways to provide effective assistance in any given

case.  Even the best criminal defense attorneys would not defend a particular client in the same

way."  <u>Id</u>.  In the instant case, defense counsel in fact vigorously cross-examined the witnesses on

many issues.  This Court cannot say that counsel's cross-examination was so deficient as to violate

petitioner's constitutional rights, and petitioner certainly has not shown that he was prejudiced by

the fact that some questions went unasked.

        Petitioner next faults trial counsel for failing to challenge petitioner's identification

as impermissibly suggestive.  The United States Fifth Circuit Court of Appeals has noted:

> The admissibility of identification evidence is governed by a two-step
> analysis.  Initially, a determination must be made as to whether the
> identification procedure was impermissibly suggestive.  Next, the
> court must determine whether, under the totality of the circumstances,
> the suggestiveness leads to a substantial likelihood of irreparable
> misidentification.

<u>Herrera v. Collins</u>, 904 F.2d 944, 946 (5th Cir. 1990) (footnote omitted).  As to the second step, the

Fifth Circuit offered the following guidance:

> In <u>Manson v. Brathwaite</u>, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140
> (1977), the Supreme Court indicated that "reliability is the linchpin"
> when examining the totality of the circumstances to "determin[e] the
> admissibility of identification testimony."  <u>Id</u>. at 114, 97 S.Ct. at
> 2253.  Even an impermissibly suggestive identification procedure
> does not violate due process so long as the identification possesses
> sufficient aspects of reliability.  The Supreme Court has set forth
> several factors to be considered when reviewing the reliability of a
> pre-trial identification.  These factors include

> (1) the opportunity of the witness to view the criminal, (2) the witness's degree of attention, (3) the accuracy of the description, (4) the witness's level of certainty, (5) the elapsed time between the crime and the identification, and (6) the corrupting influence of the suggestive identification itself.

Herrera, 904 F.2d at 947.

What petitioner's contention ignores is the fact that the instant case does not involve an instance in which the witnesses' identification is based on a brief encounter with a total stranger. Where, as here, the witnesses immediately recognized the perpetrator at the crime scene as someone they *already know*, there simply is no "substantial likelihood of irreparable misidentification." See United States v. Hefferon, 314 F.3d 211, 219 (5th Cir. 2002); United States v. Buckhalter, 986 F.2d 875, 878 (5th Cir. 1993). Accordingly, counsel was not deficient in failing to further challenge the identification and petitioner was not prejudiced as a result.

Lastly, petitioner faults counsel for not objecting on hearsay grounds to McKay's testimony that, immediately after the shooting, Gillard said "Greg had shot Eric. Greg had shot Eric."[55] That claim, too, is meritless. First, the statement qualifies as an "excited utterance" and, therefore, was not impermissible hearsay. La. Code Evid. 803(2). Second, even if it had been hearsay, there was no need to object at that point in the trial. When McKay testified regarding the statement, Gillard had already testified at trial that he was asleep when the shooting occurred and

---

[55] State Rec., Vol. III of IV, transcript of November 12, 1998, p. 45.

so had not in fact seen petitioner shoot the victim.[56]  Accordingly, clearly no prejudice resulted from counsel's failure to object to McKay's testimony.

Lastly, perhaps recognizing that the trial counsel's individual "errors" do not warrant relief, *habeas* counsel argues that the "errors," when considered collectively, do.  This Court disagrees.  When, as here, the individual contentions are meritless, that result cannot be changed simply by asserting them collectively.  United States v. Hall, 455 F.3d 508, 520 (5th Cir. 2006), cert. denied, 127 S.Ct. 2029 (2007); Miller v. Johnson, 200 F.3d 274, 286 n.6 (5th Cir. 2000).  As the United States Fifth Circuit noted with respect to analogous claims of cumulative error:  "Twenty times zero equals zero."  Mullen v. Blackburn, 808 F.2d 1143, 1147 (5th Cir. 1987).

For all of the foregoing reasons, this Court finds that petitioner has not demonstrated that the state court's decision reject his ineffective assistance of counsel claims was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  Accordingly, applying the AEDPA's deferential standard, this Court likewise rejects those claims.

**RECOMMENDATION**

Accordingly, **IT IS RECOMMENDED** that the petition for federal *habeas corpus* relief filed by Kevin Sholes be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on

---

[56]  State Rec., Vol. III of IV, transcript of November 12, 1998, p. 39.

appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this twelfth day of September, 2007.

**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**